**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

CASEY SANCHEZ,                                )
                                             )
         Plaintiff,                           )
                                             )
v.                                            )        No. 1:24-cv-1194-KRS-GJF
                                             )
RIO ARRIBA COUNTY SHERIFF                     )
DEPUTY AARON MARTINEZ;                        )
RIO ARRIBA COUNTY SHERIFF                     )
DEPUTY MARCUS MARTINEZ;                       )
and RIO ARRIBA COUNTY SHERIFF                 )
DEPUTY TREVOR WALKER,                         )
                                             )
         Defendants.                          )

## ORDER DENYING SUMMARY JUDGMENT MOTION WITHOUT PREJUDICE

Plaintiff Casey Sanchez brought this action in the First Judicial Court, County of Rio Arriba, State of New Mexico (Doc. 1-1), alleging that his Fourth Amendment rights had been violated by three Rio Arriba County sheriff deputies who came to his house on the evening of April 8, 2024 to investigate a 911 call. The County of Rio Arriba removed Plaintiff's state court complaint to federal court, and Plaintiff then filed an amended complaint omitting any claims against the County and identifying the previously named John Doe defendants as Rio Arriba County Sheriff Deputies Aaron Martinez, Marcus Martinez, and Trevor Walker (collectively "the Deputy Defendants"). *See* (Doc. 23). The Deputy Defendants have filed a Motion for Summary Judgment ("Motion") (Doc. 26), arguing that they are entitled to judgment as a matter of law on Plaintiff's Fourth Amendment claims under the doctrine of qualified immunity. The Court has jurisdiction to decide the Motion pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73(b). Having carefully considered the parties' arguments and applicable law, the Court concludes that it must

deny the Motion due to an inadequate record. The denial is without prejudice to the Deputy

Defendants filing an amended motion correcting, if they are able, the deficiencies discussed below.

**Factual Background**

This section presents a general overview of the case for background purposes only, and

may include both disputed and undisputed facts.[1] On or about April 8, 2024, the Los Alamos Police

Department Dispatch Center ("LAPD Dispatch") received a number of 911 calls from one or more

female callers, which it forwarded to the Rio Arriba County 911 Central Dispatch Center ("Central

Dispatch") for investigation and follow-up. The parties have differing versions of what the Deputy

Defendants knew or should have known about the 911 caller or callers and the address where the

caller or callers was or were located. The Court sets out both versions below.

*The Deputy Defendants' version.* The Deputy Defendants contend that the calls were all

from the same "unknown female caller," who told the dispatch operator that she was with her

boyfriend, who had a handgun and was trying to kill her. The operator could hear arguing in the

background, and the caller seemed to be addressing the dispatcher directly only when the male

was out of the room, speaking in a whisper as though concealing from the male the fact that the

caller was on the phone. The distressed caller stated she did not know the address of her location,

and knew only that she was in "Dixon City." She also said that there was a white dog outside the

house. The dispatcher or dispatchers determined that the calls were coming from a disconnected

cellular line that was only capable of placing calls for emergency assistance. The information

provided by the caller's phone was limited, allowing location of the signal only within what

---

[1] The Deputy Defendants' Motion includes a Statement of Undisputed Material Facts ("SUMF") (Doc. 26 at 4), while Plaintiff's opposition brief includes a paragraph-by-paragraph response to the Deputy Defendants' SUMF, which also purports to include additional "Undisputed Plaintiff's Material Facts" (Doc. 34 at 8). Despite these submissions, the Court declines to make findings of undisputed material facts on the current record, for reasons that will be discussed later in this Order.

dispatchers termed "quite a big uncertainty radius." (Doc. 26 at 6). LAPD Dispatch provided Central Dispatch with coordinates for the location of the call, which placed the caller in an area between Dixon and Embudo. Central Dispatch contacted the cellular service company for the disconnected cell phone in an attempt to obtain additional information from the caller's phone line that would assist in locating the caller. At the request of the cellular service company, Central Dispatch filled out an "Exigent Circumstances" form, which was required for the company to provide more accurate location information. LAPD Dispatch provided the address "2169B State Road 68" as a possible location for the caller. The Deputy Defendants were looking for that address when, at a property located on State Road 68, they came upon a trailer bearing the number 2169, which was Plaintiff's trailer home.[2] As they approached the home, the Deputy Defendants saw a white dog outside. The Deputy Defendants assert that it was determined several hours after the encounter with Plaintiff[3] that the address "2169B State Road 68" belonged to the cellular tower that had been relaying the 911 caller's transmissions, and that the cellular tower in question was located approximately three-quarters of a mile away on a hill behind—and was visible from— Plaintiff's property. (Doc. 26 at 5-7 (SUMF ¶¶ 5-17, 22-23)).

---

[2] If these facts seem somewhat disjointed, they are presented that way in the Deputy Defendants' SUMF. A more detailed explanation, albeit from Plaintiff's two-caller perspective, is provided in Plaintiff's response brief: "Different dispatchers gave different possible locations for caller #2[.] [O]ne dispatcher gave an address … which involves a radius from Velarde to Pila, New Mexico. A different dispatcher gave … different coordinates [and] when [Defendant Walker] entered them into [his] GPS [he is heard on the video recording from his body camera] say[ing] 'this is weird' as [if] he did not get what he was looking for. And yet a different dispatcher … gave the address for the tower located at 2169B, State Road 68." (Doc. 34 at 5-6). Plaintiff continues: "When the County defendants attempted to locate the tower which dispatch indicated was located at 2169B, State Road 68 in their effort to locate caller #2 they ended up at a vacant lot per A. Martinez lapel Video,… and running out of options went to a location … 'approximately three-quarters of a mile away on [a] hill behind—and was visible from Plaintiff's property,'" before ending up at Plaintiff's trailer. (*Id.* at 7). Other than providing more information and details, Plaintiff's description about how the Deputy Defendants ended up at his trailer does not vary all that much from the Deputy Defendants' explanation, and both sides provide record citations to support their version of events.

[3] If this information was received, as the Deputy Defendants state, several hours later, its relevance to the Deputy Defendants' qualified immunity defense is unclear, since that defense turns on what the Deputy Defendants knew or should have known when they knocked on Plaintiff's front door.

*Plaintiff's version*. According to Plaintiff, there were two female 911 callers on the evening of April 8, 2024.[4] Plaintiff contends that the dispatch records and recordings identify Caller #1 as Simona Herrera, who called 911 regarding a "domestic' situation." Plaintiff states that the dispatchers had an address for Ms. Herrera of 8 Private Drive 1124, Dixon, and that officers had been to Ms. Herrera's home the day before, yet "despite having the address and that officers went to her home the day before, the deputies needed instructions on how to identify her home, which Ms. Herrera indicated had a 'Gray truck' in front of it." (Doc. 32 at 2). The dispatch records also identify the suspect in the domestic situation reported by Ms. Herrera—a person named Daniel Arellano. Plaintiff contends that the officers detained Mr. Arellano after finding that he had a handgun, that "an exigent circumstance form had to be filled out," and that "Simona Herrera had suicidal ideations, because of the conduct of Daniel Arellano." (*Id.* at 2-3).

The second female 911 caller, according to Plaintiff, did not give her address or the nature of her emergency. (*Id.* at 2). Plaintiff contends that the dispatch records and recordings indicate that Caller #2 was drinking and taking prescribed medication after having her legs amputated, and that she did not give her address or the nature of her emergency. Caller #2 indicated there was a "charcoal Honda Accord" in the front of the residence she was staying at, as well as a white dog outside. (*Id*. at 3, 4). Plaintiff argues that the Deputy Defendants "disingenuously argue that they came upon a trailer bearing the number 2169 and as they approached the trailer they saw a white dog," but the "fact of the matter is that the deputies were lost and were determined to enter any of the trailers near 2169 and when they came to the area where plaintiff was located Defendant Aaron

---

[4] The Deputy Defendants complain that Plaintiff failed to allege his two-caller theory in the complaint. *See* (Doc. 36 at 6). But it is unclear to the Court why that matters. Unlike certain factual allegations in the complaint related to Plaintiff's unlawful seizure and excessive force claims, which the Deputy Defendants argue are judicial admissions, there are no factual allegations in the complaint—or at least the Deputy Defendants have pointed to none—that Plaintiff's two-caller theory would contradict.

Martinez remarked "Multiple Trailers with No Numerics will Back Out and Att to make 25." (*Id.* at 7).

Both the Deputy Defendants' version and Plaintiff's version of how and why the Deputy Defendants ended up at Plaintiff's home on the evening of April 8, 2024 are based solely on the 911 phone calls and dispatch records. Neither party has submitted any evidence outside of those phone calls and dispatch records to show what the Deputy Defendants knew or thought when they arrived at Plaintiff's home—there is no deposition testimony and no affidavits from any 911 operator or, most troubling, the Deputy Defendants. This means, as Plaintiff points out (Doc. 34 at 1), there is no testimony in the record from Defendants themselves (either deposition or affidavit testimony) explaining what they knew when they knocked on Plaintiff's door and searched his home. What happened after they knocked on Plaintiff's door, however, is mostly not in dispute,[5] and is revealed somewhat in the video footage from one or more of the Deputy Defendants' body cameras.[6]

The Deputy Defendants knocked on the front door of Plaintiff's house several times before he appeared. Plaintiff had been taking a bath at the time, and came to the door without a shirt or shoes and pulling his pants up. The Deputy Defendants asked Plaintiff to confirm that the street number associated with his house was 2169, and when he did, the Deputy Defendants asked Plaintiff to step outside. Plaintiff did so, while also asking, "What is going on?" The Deputy Defendants did not respond to the question, instead asking Plaintiff whether anyone else was in

---

[5] One significant disputed fact about the Deputy Defendants' interaction with Plaintiff is whether a gun was pointed at Plaintiff at any point during the encounter. The Court does not need to resolve that issue at this time.

[6] The Court notes that most of the video footage in the record indicates it is from a body camera worn by "G. Martinez." The two defendants in this case named Martinez are Aaron Martinez and Marcus Martinez. Without further information that is currently missing from the record, the Court is unable to determine whose body camera recorded the footage labeled "G. Martinez."

the house. Plaintiff answered no. The Deputy Defendants placed Plaintiff in handcuffs, and told

him to remain outside with Deputy Walker, while Deputies Aaron Martinez and Marcus Martinez

went into the house to look for the 911 caller. After Deputy Aaron Martinez and Deputy Marcus

Martinez searched the premises and failed to locate the 911 caller, Plaintiff was released and told

he could return to his home.

## Standard of Review

### A.    Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R.

CIV. P. 56(a).  "A fact is material if, under the governing law, it could have an effect on the outcome

of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the

nonmoving party on the evidence presented." *Smothers v. Solvay Chems., Inc*., 740 F.3d 530, 538

(10th Cir. 2014) (internal quotation marks and citation omitted). The court construes all evidence

in the light most favorable to the plaintiff, as the non-moving party, and does not decide issues of

credibility. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 1986); *Shero v. City of Grove*, 510

F.3d 1196, 1200 (10th Cir. 2007). While the plaintiff's version of the facts must find support in the

record, to survive a motion for summary judgment the plaintiff "need only present evidence from

which a jury might return a verdict in his favor." *Anderson,* 477 U.S. at 256.

### B.    Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known.'" *Pearson v. Callahan,* 555 U.S. 223, 231

(2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The doctrine "'gives ample room

6

for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Pursuant to the two-step framework articulated in *Saucier v. Katz*, in deciding whether an official is entitled to qualified immunity, a court considers (1) whether the defendants' actions violated the plaintiff's constitutional rights, and (2) whether the right was clearly established at the time of the alleged misconduct. 533 U.S. 194, 201 (2001). The court may address the two prongs of the qualified immunity inquiry in whatever order it chooses "in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. "When a defendant asserts qualified immunity in a summary judgment motion, the plaintiff must show that (1) a reasonable jury could find facts supporting a violation of a constitutional right and (2) the right was clearly established at the time of the violation." *Wilkins v. City of Tulsa, Oklahoma*, 33 F.4th 1265, 1272 (10th Cir. 2022). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right. A Supreme Court or Tenth Circuit decision on point or the weight of authority from other courts can clearly establish a right. [A] case directly on point is not necessary if existing precedent [has] placed the statutory or constitutional question beyond debate." *Id.* (internal quotation marks and citations omitted).

In deciding a motion for summary judgment on qualified immunity grounds, the court must view the facts and draw reasonable inferences in the light most favorable to the party opposing summary judgment. *Scott v. Harris*, 550 U.S. 372, 380. But "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by [videotape evidence in] the record, so

7

that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*; *see Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1207 (10th Cir. 2017) (the court "cannot ignore clear, contrary video evidence in the record depicting the events as they occurred").

## Discussion

Plaintiff alleges that the actions of the Deputy Defendants violated his constitutional rights to be free from unlawful detentions or arrests (Count I), use of excessive force (Count II), and unreasonable searches of his home (Count III). Whether the Deputy Defendants were justified in searching the house is one of the circumstances that will affect an evaluation of whether Plaintiff's detention was lawful and whether the force used by the Deputy Defendants to detain Plaintiff was excessive. Accordingly, the Court's analysis in this Order focuses on Plaintiff's Fourth Amendment claim in Count III alleging the search of his house was illegal.[7]

### A.    Existence of A Constitutional Violation

"[S]earches and seizures inside a home without a warrant are presumptively unreasonable." *Armijo ex rel. Armijo Sanchez v. Peterson*, 601 F.3d 1065, 1070 (10th Cir. 2010) (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980)). An exception to the warrant requirement, however, is where "'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Id.* (quoting *Mincey v. Arizona*, 437 U.S. 385, 393–94 (1978) (citations omitted)).[8] One of those situations is where police

---

[7] The Court will defer discussion of Plaintiff's Fourth Amendment claims in Counts I and II until the Deputy Defendants file an amended summary judgment motion.

[8] Another exception to the requirement of a warrant is where the person consents to the search. *See Hughes v. Schmidt,* No. CV 22-3712, 2026 WL 499121, at *8 (E.D. Pa. Feb. 23, 2026) ("[T]he Fourth Amendment prohibition against warrantless entry of a person's home 'does not apply ... to situations in which voluntary consent has been obtained[.]'" (quoting *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990)). The Deputy Defendants point to a recording from one of the officer's lapel video cameras to argue that the officer in question asked if he "could look inside," to which Plaintiff responded: "I guess. But I don't understand what you guys are doing." (Doc. 26 at 7 (SUMF, ¶ 18)). Plaintiff, however,

officers have an "objectively reasonable basis for believing" that someone inside needs emergency assistance. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 406 (2006); *see also Caniglia v. Strom*, 593 U.S. 194, 198 (2021) (officers may enter a home to "render emergency assistance to an injured occupant or to protect an occupant from imminent injury" (internal quotation marks and citation omitted); *Armijo*, 601 F.3d at 1070 ("One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." (quoting *Brigham City, Utah*, 547 U.S. at 403). In applying the exigent circumstances exception, the court must "evaluate the circumstances as they would have appeared to prudent, cautious, and trained officers. When circumstances objectively justify the officers' actions, [the court] do[es] not consider the officers' subjective motivations." *Armijo*, 601 F.3d at 1071 (internal quotation marks and citations omitted). The "burden of establishing that the threats posed exigent circumstances justifying the warrantless entry" is on the police officers who entered the home. *Id.* at 1070 (citing *United States v. Reeves*, 524 F.3d 1161, 1169 (10th Cir. 2008)).[9]

---

states that his consent was invalid because, at the same time as he was being asked to give his consent, "a gun [was] pointed at him while he was being handcuffed." (Doc. 34 at 13). The Deputy Defendants ask the Court to consider Plaintiff's asserted verbal consent in determining whether their warrantless search was objectively reasonable. (Doc. 26 at 16). But if it was objectively unreasonable to believe there was an emergency, then Plaintiff's "half-hearted" (as the Deputy Defendants call it) consent would not transform an unreasonable belief into a reasonable belief. In other words, consent and exigent circumstances are two separate bases for dispensing with the warrant requirement, and, as far as the Court can tell, the Deputy Defendants are relying only on the exigent circumstances exception in arguing that their search of Plaintiff's home did not violate Plaintiff's constitutional rights. At the very least, the Deputy Defendants do not respond to the case law cited by Plaintiff in his response brief to support his argument that the consent was not voluntary, and for that reason have waived any independent consent argument here.

[9] In a recent decision, the United States Supreme Court rejected a higher "probable cause" standard for entering a home to conduct a welfare check, reaffirming that the correct standard requires only that police officers have "'an objectively reasonable basis for believing' that their intervention was needed to prevent serious harm." *Case v. Montana*, 607 U.S. __, ___, 146 S. Ct. 500, 507, 508 (Jan. 14, 2026). The Court cautioned, however, that "an emergency-aid entry provides no basis to search the premises beyond what is reasonably needed to deal with the emergency while maintaining the officers' safety." *Id*. at 507. There is no clam here that the Deputy Defendants' search of Plaintiff's home went beyond what was necessary to check for the presence of a person in distress.

### 1.     Record Support For The Deputy Defendants' SUMF

"The objective reasonableness of an officer's conduct under *Brigham City*, as in other Fourth Amendment contexts, is evaluated by looking at the 'totality of the circumstances.'" *Case,* 146 S. Ct. at 508. But it is difficult for the Court to evaluate the totality of the circumstances here because the record is insufficient to determine which facts have record support and which are genuinely in dispute.

The record consists of (1) a document the Deputy Defendants refer to as a "CAD Master Call Table" (Exhibit A); and (2) the audio recordings of one or more 911 calls.[10]

### a.     Exhibit A—CAD Master Call Table

Plaintiff asserts that the CAD Master Call Table contains input from three different dispatch centers—LAPD Dispatch, Central Dispatch, and the Espanola/Rio Arriba E911 Center—and lacks foundation. (Doc. 34 at 1 (arguing that the Deputy Defendants "do not provide an affidavit to establish the foundation for any of the three dispatchers")). Plaintiff claims that, by merging the records of three different dispatch centers into a single document—Exhibit A—the Deputy Defendants create the impression there was only one 911 caller, when there were actually two. (*Id.* at 4). Plaintiff argues that, without an adequate foundation, Exhibit A is inadmissible.

When a party objects "that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence," FED. R. CIV. P. 56(c)(2), "[t]he burden is on the proponent to show that the material is admissible as presented or to explain the admissible form

---

[10] The only additional items in the record is video footage from one or more of the officers' body cameras. Plaintiff cites to video evidence from Defendant Aaron Martinez's body camera on the issue of exigent circumstances, but the remaining citations to video evidence by either side are to support or oppose summary judgment on Plaintiff's illegal detention and excessive force claims in Counts I and II. Therefore, the Court will not address the video evidence at this time.

that is anticipated," *id.,* advisory committee's note to 2010 amendment. The Deputy Defendants

rely on *Jacoby v. Keers*, where the Eleventh Circuit explained application of this rule as follows:

> A record of an organization's regularly conducted activity or a record made at or near the time of an event by someone with knowledge of the event is self-authenticating. FED. R. EVID. 902(11), 803(6).
>
> The district court did not abuse its discretion in holding that the defendants' exhibits can be considered at the summary judgment stage. When a Rule 56(c)(2) objection is made, it is within the district court's discretion to determine if the material used to support a fact can be presented in a form that would be admissible at trial. The defendants explained in their reply brief in support of their motion for summary judgment that they anticipate that the exhibits would be admissible at trial as business records. It was within the district court's discretion whether to accept that explanation, and it did not abuse that discretion in doing so.

779 Fed. Appx. 676, 679 (11th Cir. 2019) (unpublished). Relying on *Jacoby*, the Deputy

Defendants argue that they "need not present a witness to authenticate the self-authenticating CAD

records; it is sufficient to state – as Defendants hereby do – that if Plaintiff were to refuse to

stipulate to the admissibility of the CAD records prior to any trial, Defendants would certainly

offer a foundation witness." (Doc. 36 at 9).

The documents that were at issue in *Jacoby* were photographs. 779 Fed. Appx. at 679. The

CAD records at issue here are very different from photographs. They have been challenged on the

ground that they consist of business records from multiple different entities, which have been

merged as if they are a single business record. If that is the case, Exhibit A is not a record of a

single entity "made at or near the time of" the event, but a compilation of multiple records made

at or near the time of the event by different entities. It could be admissible, but might require

additional foundation and authentication under some other rule, such as FED. R. EVID. 1006. In

*Lerner & Rowe PC v. Brown Engstrand & Shely LLC*, the defendants asserted that certain call log

entries were inadmissible hearsay. The court rejected the objection because it was "likely to be

11

overcome at trial by testimony satisfying the business records exception," in that "[t]here appear[ed] to be no doubt that the logs were made and retained by Defendants in the regular course of their business, by employees receiving the incoming calls and recording contemporaneous statements. And deposition testimony show[ed] that the call logs were created by Defendants as a regular practice." 673 F. Supp. 3d 1017, 1029–30 (D. Ariz. 2023). If Plaintiff is correct about the source of the information in Exhibit A, however, this case may be more like *King v. Hardesty*, 464 F. Supp. 2d 892 (W.D. Mo. 2006), *aff'd in part, rev'd in part on other grounds*, 517 F.3d 1049 (8th Cir. 2008), where the defendant submitted a report consisting of a computer program compilation of information pertaining to telephone calls placed to the plaintiff, and plaintiff objected to the report as being inaccurate. *Id.* at 895. The court struck the report, stating that, on the current record, the defendants had failed to lay an adequate foundation. *Id.*

Significantly, business records become self-authenticating when "a certification of the custodian or another qualified person" is provided, *and* "[b]efore the trial or hearing, the proponent [has] give[n] [the] adverse party reasonable written notice of the intent to offer the record—and [has] ma[d]e the record and certification available for inspection—so that the party has a fair opportunity to challenge them." FED. R. EVID. 902(11). As the Tenth Circuit has held, "[w]hile the party opposing summary judgment need not produce evidence in a form that would be admissible at trial, the content or substance of the evidence must be admissible." *Law Co. v. Mohawk Constr. & Supply Co.*, 577 F.3d 1164, 1170 (10th Cir. 2009) (quoting *Wright–Simmons v. City of Okla. City*, 155 F.3d 1264, 1268 (10th Cir. 1998) (quotation and ellipsis omitted)). To be admissible, documents other than those produced by the opposing party during discovery must be properly authenticated. *Id.* ("Because evidence must be admissible to be considered on summary judgment, the proper inquiry here is under Federal Rule of Evidence 901"). "The requirement of

authentication or identification as a condition precedent to admissibility does not necessarily require an affidavit; it can be satisfied by any evidence that is "sufficient to support a finding that the matter in question is what its proponent claims." FED. R. EVID. 901(a); *see Law Co.,* 577 F.3d at 1170. Examples of evidence that satisfies the authentication requirement include testimony of a witness with knowledge that an item is what it is claimed to be, FED. R. EVID. 901(b)(1), and authentication based on the "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken in conjunction with circumstances," FED. R. EVID. 901(b)(4). Exhibit A is not self-authenticating based on its appearance, contents etc., *id.* And it has not been authenticated by the testimony of a witness with knowledge explaining what it is, FED. R. EVID. 901(b)(1), 902(11). The Court has no idea how Exhibit A was created or who created it.[11]

The Court declines to consider Exhibit A because Plaintiff's objection is reasonable and should be addressed prior to a ruling on summary judgment, given the centrality of the document in question to the disputed factual issues presented in the briefing. When Plaintiff raised an objection, the Deputy Defendants should have submitted proof with their reply that Exhibit A is admissible as a business record. *See, e.g., Gallegos v. Swift & Co.*, 237 F.R.D. 633, 641 (D. Colo. 2006) (where the defendant moved to strike documentary evidence submitted with the plaintiffs' summary judgment motion because it was not properly authenticated, and plaintiffs provided affidavits in response to the motion to strike, court holds that the plaintiff's affidavits were "sufficient to cure any deficiency in the original filings"). As the Tenth Circuit explained in a similar situation:

---

[11] The Deputy Defendants cite *Acosta v. Miami Dade Cnty.*, No. 16-23241-CIV-CANNON/Otazo-Reyes, 2022 WL 1603712 (S.D. Fla. Apr. 14, 2022), but that case does not support their arguments here. The court held that it could consider a "911 Incident Recall Report" of the Miami-Dade Police Department, which contained a record of the 911 operator's annotations during the incident at issue. *Id.* at *4. But the court only addressed a hearsay challenge to the 911 Incident Recall Report. No issue had been raised about whether the report could be authenticated as a business record, only that it had not been.

> Rule 56(e) requires that documents referred to in an affidavit be "sworn or certified copies of all papers or parts thereof," thus [the plaintiff] was required to identify, under oath, the source of the documents and that they had not been altered. In his motion for summary judgment, defendant timely objected to [the plaintiff's] failure to properly authenticate the documents in her affidavit. But [the plaintiff] did not simply correct the deficiency by way of a supplemental affidavit; instead, on appeal she argues that the documents were admissible under the business-records exception to the hearsay rule. While this may be true, it would not excuse her duty to identify the source of the documents and their absence of alteration to the district court when submitted in response to a motion for summary judgment. Under these circumstances, we can not say that the district court abused its discretion in refusing to consider the documents.

*Taylor v. Principi*, 141 Fed. Appx. 705, 708 (10th Cir. 2005) (internal citations omitted).[12]

Apart from authentication issues, the contents of Exhibit A are not self-explanatory. It is replete with abbreviations and short-hand notations, requiring someone with knowledge to explain what information is being conveyed. The Deputy Defendants' SUMF essentially explains what the document supposedly shows, but "[s]tatements by counsel in briefs are not evidence." *Skyline Corp. v. N.L.R.B.*, 613 F.2d 1328, 1337 (5th Cir. 1980). In most situations like this, there would be deposition testimony explaining the document. Or else the offering party would submit an affidavit that explains the information in the document. The Deputy Defendants have offered neither type of evidence here.

---

[12] *See also Scott v. City of Minco*, 393 F. Supp. 2d 1180, 1189 (W.D. Okla. 2005) (where the defendants objected to a document relied on by the plaintiff on both authenticity and hearsay grounds, and the authenticity and truth of the document were "critical and easily could have been established through an affidavit from the record's custodian," court holds that the plaintiff had "not demonstrated that the document is or will be admissible for its truth (or any purpose)" and refused to consider it); *compare Ayoub v. Bd. of Cnty. Comm'rs ex rel. Cnty. of Santa Fe*, 964 F. Supp. 2d 1288, 1290 (D.N.M. 2013) (rejecting the plaintiff's authentication objections were the defendants "provided an affidavit of the business custodian of the County" establishing that the documents were admissible business records under FED. R. EVID. 803(6)(C)); *Augustson v. Holder*, 728 F. Supp. 2d 1279, 1283–84 (D.N.M. 2010) (holding it was proper for court to consider ATF reports because they were authenticated and a foundation was laid for finding the public records exception to hearsay applied by the declaration of an ATF agent with extensive knowledge of ATF's record-keeping system).

### b.  Audio Recordings

The Deputy Defendants' SUMF also relies heavily on audio wav files of 911 recordings. Their SUMF creates a narrative concerning the content of those recording, but that narrative, again, is not evidence. The Deputy Defendants essentially argue that the Court can reject Plaintiff's two-caller theory simply by listening to the audio recordings.[13] Assuming that is an acceptable approach to resolving the parties' disagreements regarding which asserted facts are supported by evidence, which are not, and which are genuinely disputed,[14] the Deputy Defendants have not provided any foundation for the recordings. At the very least, the Court needs to be able to identify the calls that were made and various voices heard in the recordings.[15] It is also impossible for the Court to verify that no parts of the recordings other than the specific moments cited by the Deputy Defendants are important to an accurate understanding of what transpired without listening to the entirety of the more than 2.5 hours of recordings, the sound quality of which is fairly poor, making it difficult to discern what is being said. The Deputy Defendants take umbrage at Plaintiff's assertion that they

---

[13] *See* (Doc. 26 at 8 (citing, *inter alia*, *Thomas v. Durastanti*, 607 F.3d 655, 659 (10th Cir. 2010) (noting that "[w]hile a court considering a summary judgment motion based on qualified immunity 'usually' must 'adopt[] … the plaintiff's version of facts,' that is not true to the extent that there is clear contrary video evidence [in this case, audio evidence] of the incident at issue.")).

[14] *But see In re Rex Montis Silver Co.*, 43 Fed. Appx. 222, 224 (10th Cir. 2002) (unpublished) ("'[J]udges are not like pigs, hunting for truffles buried in [records].'" (quoting *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1546 (10th Cir. 1995) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam))); *Carlson v. Cobank*, No. 1:23-CV-02402-SKC-TPO, 2025 WL 3123984, at *2 (D. Colo. Nov. 7, 2025) ("The Court has no obligation to scour the record in search of evidence to support a party's factual assertions. And where [a party] h[as] directed the Court to broad-swath record citations, the Court [can] ignore[ ] them because they equate to no citation at all." (internal quotation marks and citations omitted)); *see generally N.M. Off-Highway Vehicle All. v. U.S. Forest Serv.,* 645 Fed. Appx. 795, 803 (10th Cir. 2016) (unpublished) ("There are good institutional and practical reasons for our reluctance to wade through reams of record documents without any guidance from the parties.").

[15] *See* FED. R. EVID. 901(b) (examples of evidence that satisfies the authentication requirement includes, among other things "(5)… [a]n opinion identifying a person's voice … based on hearing the voice at any time under circumstances that connect it with the alleged speaker"; and "(6) … [f]or a telephone conversation, evidence that a call was made to the number assigned at the time to: (A) a particular person, if circumstances, including self-identification, show that the person answering was the one called; or (B) a particular business, if the call was made to a business and the call related to business reasonably transacted over the telephone").

submitted incomplete recordings.[16] The Court's concern, however, is not with defense counsel's professional integrity, but with the evidentiary foundation for the Court's consideration of the recordings. *See, e.g., Roska v. Sneddon*, 311 F. Supp. 2d 1307, 1318 (D. Utah 2004) (where the defendants asserted that the plaintiffs had "not authenticated or laid any foundation for the tape or their assertions of the tape's contents," and the plaintiffs contended that their "counsel's submission alone [was] enough because of the duties attorneys have" under the Federal Rules and as officers of the court, court holds that "Rule 11 and an attorney's oath have not replaced the evidentiary requirements for admissible evidence"), *aff'd*, 437 F.3d 964 (10th Cir. 2006).[17]

If the Deputy Defendants want to rely on the audio recordings for their summary judgment arguments, they must provide the Court with a transcript of, at a minimum, the portions of the recordings on which they rely. And if Plaintiff contends that the Deputy Defendants have omitted relevant portions of the recordings, then Plaintiff needs to provide transcripts of the missing portions that he claims establish a factual basis for his two-caller theory.[18]

---

[16] *See* (Doc. 36 at 6 n.1 (stating that Defendants "unequivocally deny" any allegation of "falsifying evidence" and asserting that the issue "merit[s] no further discussion")).

[17] Unlike in this case, the 911 call recordings that were part of the summary judgment record and considered by the court in *Acosta*, 2022 WL 1603712, were not submitted in a vacuum. The defendants also submitted deposition testimony of an officer explaining what the recordings showed. *See Acosta*, No. 16-civ-23241, Doc. 71-10 at 108-09. Furthermore, the individuals who made the 911 calls were known and identified by name, and there was deposition testimony concerning the contents of the recordings. *See, e.g., id.,* Doc. 71-5 at 20-36. And, importantly, the recordings themselves were presented in the record through *transcripts* identifying the speakers as they spoke. *See, e.g., id.,* Docs. 71-4, 71-8, 71-9, 71-11.

[18] Plaintiff argues that the Deputy Defendants' citations to the audio recordings violate "Federal Rule of Evidence 106, Remainder of Related Writings or Recorded Statement, i.e., the rule of completeness." (Doc. 34 at 4). "The rule of completeness appears to be uniquely applicable in a trial setting," but "the general principle animating the rule of completeness—guarding against deception—is appropriate at the summary judgment phase." *Lopez v. Delta Int'l Mach. Corp.*, 312 F. Supp. 3d 1115, 1154–55 (D.N.M. 2018), *aff'd sub nom. Lopez v. Stanley Black & Decker, Inc.*, 764 Fed. Appx. 703 (10th Cir. 2019). "The rule of completeness' remedy, however, is introduction of the missing material and not exclusion of the partial material." *Id*. at 1155 (citing FED. R. EVID. 106). It seems to the Court that the most efficient way to address Plaintiff's completeness objection is for each side to designate what they consider to be the relevant portions of the audio recordings, and to then jointly lodge a single set of recordings, which both sides agree is authentic and accurate, along with transcripts of those recordings, in much the same manner as parties designate portions of deposition transcripts for trial.

### 2.    Record Support For Plaintiff's "Additional" Facts

The Deputy Defendants argue that Plaintiff's two-caller theory "mak[es] no sense," and claim it is based on "bald allegations without citation to the record." (Doc. 36 at 1, 5). But the record belies both of those assertions. Plaintiff cites to evidence in the record to support his two-caller theory, and the Deputy Defendants indirectly acknowledge that he does, when they argue about what those citations actually show. For instance, with regard to Plaintiff's citation to a portion of the video recording from Defendant Aaron Martinez's body camera concerning a charcoal Honda Accord, the Deputy Defendants argue "[c]learly the dispatcher was not conveying a contemporaneous statement by the caller that the Honda was outside her current location." (Doc. 36 at 9).[19] The Deputy Defendants go on to make further arguments about the lapel video and grey vehicle more appropriately considered by a trier of fact in resolving disputed fact issues than by a court as a matter of law on summary judgment. *See, e.g.,* (*id*. at 10 (discussing Plaintiff's citations to a portion of the audio recordings in which the deputies announce themselves loudly and the dispatch operator asks the caller, who is on the line with the dispatch operator, whether she can hear the deputies). The point is that Plaintiff does cite to evidence in the record to support his two-caller theory, and the Deputy Defendants primarily respond by arguing the meaning or significance

---

[19] Plaintiff's description of the recording suggests that the statement *was* made about a contemporaneous fact, which makes sense in the context of what the conversation was about. *See* (Doc. 34 at 4-5 ("[A]t one point caller #2 was on with dispatch at the same time that dispatch was on with one of the [officers] in front of plaintiff's residence and he was able to talk to Caller #2 indirectly and he asked her via the dispatcher what kind of car was in her front yard, and she indicated … a 'charcoal Honda Accord.'")). If, after listening to the recording, reasonable minds could differ about what the speaker meant, then the Deputy Defendants' assertion that "*clearly*" the speaker's comment about the Honda was not a contemporaneous statement, is argument and therefore only raises a disputed fact question. *See Est. of Harmon v. Salt Lake City,* 134 F.4th 1119, 1122 (10th Cir. 2025) ("If the recording[s] do[ ] not clearly depict an action, and the evidence can reasonably be interpreted to support either party's version of what happened, we would need to credit the version given by the [non-moving parties]." (citing *Baca v. Cosper*, 128 F.4th 1319, 1324 (10th Cir. 2025)).

of the evidence, which in most cases would raise a disputed issue of fact that would prevent entry of summary judgment in the Deputy Defendants' favor.[20]

In an attempt to avoid a disputed fact issue, the Deputy Defendants argue that, even if Plaintiff's two-caller theory has factual support, "Plaintiff provides no evidence that the deputies even suspected that two different women were calling 911, and it is not clear from any evidence in the record that dispatchers themselves knew of any second caller, " but "[e]ven if the dispatchers believed that two separate women in distress were calling at the same time, … they did not convey that information to the deputies." (Doc. 36 at 6). This argument actually calls attention to another defect in the Deputy Defendants' Motion, which is that there is no testimony—either by deposition or by affidavits—from the Deputy Defendants themselves concerning what information they had and relied on in searching Plaintiff's trailer. The Deputy Defendants bear the burden of justifying their warrantless entry into Plaintiff's home on the basis of exigent circumstances. *See, e.g., Westry v. Ahearn*, *N*o. 3:22-cv-686 (MPS), 2026 WL 608287, at *7 (D. Conn. Mar. 4, 2026) (referring to the burden as "heavy" (quoting *Chamberlain Est. of Chamberlain v. City of White Plains,* 960 F.3d 100, 106 (2d Cir. 2020))). The Deputy Defendants must justify their belief as to both "the existence of an emergency," and "the reason for linking the perceived emergency with the area or place into which [they] … intrude[d]," i.e., Plaintiff's home. *United States v. Giambro*, 126 F.4th 46, 54–55 (1st Cir. 2025) (internal quotation marks and citation omitted). The Court does not believe there is

---

[20] Indeed, as Plaintiff points out, there are a number of examples in the record where the Deputy Defendants themselves admit facts that tend to support the two-caller theory. For instance, at one point, the Deputy Defendants argue that "the caller had already shown herself to be *impaired*." (Doc. 36 at 10 (emphasis added)).  That word might describe the second caller under Plaintiff's two-caller theory, who supposedly was intoxicated and on medications; but nothing in the Deputy Defendants' SUMF suggests that the one and only caller they say they were looking for, who was in fear for her life, was "impaired." The Deputy Defendants also admitted in their answer that, in an effort to locate the 911 caller, they "visited several locations" and "relied on multiple sources of information." (Doc. 24 at 4 (¶ 13)). As Plaintiff points out in his response brief: "Who the 'multiple sources of information' the defendants relied on is not mentioned, [and] also missing are any affidavits from the alleged 'multiple sources' that provided the information.'" (Doc. 34 at 1).

currently an evidentiary basis in the record from which it could be concluded that the dispatch records and recordings submitted by the Deputy Defendants establish what the Deputy Defendants knew about the 911 calls. The Court cannot just assume that all of the Deputy Defendants had first-hand knowledge of all of the information in those records or that all of the information in those records was conveyed to the Deputy Defendants. And like Plaintiff, the Court finds the absence of any affidavit by the Deputy Defendants saying what they knew—or even an affidavit by one or more of the dispatchers involved explaining what they told the Deputy Defendants—to be a significant omission.

Beyond that, even if the Court were to assume that the Deputy Defendants were *not* privy to information in the recordings or CAD records cited by Plaintiff as suggesting the existence of two 911 callers, that would not necessarily mean that the Deputy Defendants would be entitled to qualified immunity. Rather, that would raise a question about whether a mistake of fact was made regarding the existence of exigent circumstances. "[T]he reasonableness of a mistake of fact … does not pertain to the ultimate qualified immunity determination, but rather whether there was a constitutional violation in the first instance." *Jones v. Treubig*, 963 F.3d 214, 231 (2d Cir. 2020) (citing *Saucier*, 533 U.S. at 205). "This question is in contrast to an officer's mistaken belief about the legality of the conduct, which is analyzed at 'step two' in the *Saucier* framework." *Id*. "And, importantly, disputed material issues regarding the reasonableness of an officer's perception of the facts (whether mistaken or not) is the province of the jury, while the reasonableness of an officer's view of the law is decided by the district court." *Id.* The Deputy Defendants argue that "[i]t does not matter that, in retrospect, information provided to the officers was wrong." *Armijo*, 601 F.3d at 1072. That is a correct statement of law, but the Deputy Defendants then commit the very mistake they accuse Plaintiff of by arguing that "Plaintiff provides no evidence that the deputies"

suspected that there were two different 911 callers. What the deputies subjectively believed is not the relevant inquiry. The relevant inquiry is, given the facts known by the officers, whether it was objectively reasonable for them to believe there was an emergency involving a threat to life or limb and if so, whether it was objectively reasonable for them to believe the emergency was taking place in Plaintiff's house. And in this case, the Deputy Defendants have not established as a matter of undisputed fact on the current record what facts were known to them.

In sum, if the Court were to assume for sake of argument that the facts concerning the existence of exigent circumstances in this case were as Plaintiff claims they were and that the Deputy Defendants simply made a mistake, even a good faith mistake is insufficient to support the Deputy Defendants' claim that they are entitled to qualified immunity without "an additional jury finding that the mistake was reasonable" given what the Deputy Defendants knew (when what they knew is disputed). *Jones*, 963 F.3d at 228 ("A mistake of fact, … in the absence of an additional jury finding that the mistake was reasonable (when there are disputed material facts on that question) is insufficient to support an officer's claim that he is entitled to qualified immunity[.]"). Therefore, the Deputy Defendants would only be entitled to qualified immunity at the summary judgment stage if they could show that no reasonable juror could conclude that the facts concerning the existence of exigent circumstances in this case were as Plaintiff contends. And even the Deputy Defendants concede that if Plaintiff's rendition of what happened on the night of April 8, 2024 has factual support in the record, then his allegations of "actionable conduct on the part of one or more of the Defendants" might have some merit. (Doc. 26 at 11).

**B.    Clearly Established Law**

There is still the possibility of resolving the Moton on the present record if the Deputy Defendants could show that, taking Plaintiff's facts as he alleges them, the law was not clearly

20

established that the Deputy Defendants' entry into Plaintiff's home to search for the 911 caller violated Plaintiff's right to be free from unreasonable searches. The Deputy Defendants rely on *Armijo*. In that case, officers investigating a bomb threat at a high school identified the plaintiff's son as a suspect from cellular phone records and other tips, and went to the plaintiff's home to investigate, where they entered the home, found the son in bed, removed him to the porch in handcuffs, and then searched the residence. 601 F.3d at 1069. Once they satisfied themselves that the bomb threat had not come from the son, the officers removed the handcuffs and left. *Id.* The Tenth Circuit held that the officers had conducted the search of plaintiff's home based on a reasonable belief that the plaintiff's son had been involved in the bombing plot, and that the exigent circumstances of a possible imminent attack on the school justified their actions of entering the home without further investigation. *Id.* at 1072. The court observed that "the Fourth Amendment evaluates reasonableness based upon what the officers reasonably believed at the time. It does not matter that, in retrospect, information provided to the officers were wrong." *Id*. According to the Deputy Defendants, they were faced with circumstances similar to those at issue in *Armijo*— essentially, "a tense, confusing situation in which … [the Deputy Defendants] were attempting to locate an anonymous 911 caller in apparent mortal danger, on an un-traceable line, in a poorly lit rural area at night." (Doc. 36 at 5).

Plaintiff, on the other hand, argues that this case is like *Kerman v. City of New York*, 261 F.3d 229 (2nd Cir. 2001). In *Kerman*, the plaintiff's girlfriend, concerned about threats he had made to kill himself or his psychiatrist and at the advice of his psychiatrist, called the police without identifying herself, saying only that a mentally ill man who could be found at the plaintiff's address was off his medication and acting crazy and possibly had a gun. *Id.* at 232. The plaintiff was in the shower when the police arrived, and when he finally answered the door, the police

pushed their way in, jumped on his back, grabbed and pulled his arms to his back in order to handcuff him, and proceeded to search his apartment. *Id.* at 232-33. While the police were there, the girlfriend called the apartment but the police would not let her speak to the plaintiff, made no attempt to confirm the urgency of the original anonymous 911 call, and hung up on the girlfriend. *Id.* at 233. The court held that, although the information known to the police officers may have presented an imminent threat of harm, the anonymous 911 call alone, without any corroborating evidence of the alleged a danger to establish reliability, did not justify the policy officer's invasion on plaintiff's privacy interest in his home. *Id.* at 236.

The Deputy Defendants' reliance on *Armijo* is not particularly persuasive here, as that case did not involve a warrantless entry into a home where the sole basis for the officers' belief that exigent circumstances justified the warrantless entry was an anonymous 911 call. Rather, the officers in *Armijo* had identified the plaintiff's son as the only potential suspect in a plot to attack a school, which they believed to be imminent, based on information they knew about the son apart from the anonymous bomb threat that had been called into the school, and they went to an address that they knew was where the son lived. 601 F.3d at 1068. The issues here are (1) whether it was objectively reasonable for the Deputy Officers to rely solely on an anonymous 911 caller as to the existence of exigent circumstances; and (2) whether the Deputy Officers had an objectively reasonable basis for linking the perceived emergency with Plaintiff's home. *Armijo* is not helpful on either one of those issues. As to the first question, Plaintiff's citation to *Kerman* is more on point, because, as noted, *Kerman* held that "an anonymous and uncorroborated 911 … by itself, [can]not provide the foundation for a reasonable belief that exigent circumstances existed." *Mizrahi v. City of New York,* No. 15-CV-6084 (ARR) (LB), 2018 WL 3848917, at *17 (E.D.N.Y. Aug. 13, 2018) (reaching similar result, quoting *Kerman*, 261 F.3d at 238).

22

Beyond *Kerman,* however, the case law is somewhat of a mixed bag, seemingly turning on whether the overall circumstances confronted by the officers buttressed or refuted the anonymous 911 call.[21] "The range of 911 calls lie on a spectrum. At one end of the spectrum are those frantic calls from a person inside a home who is able to say someone is attacking him or her, or a member of the family. Such a call alone might be enough to provide a basis for the exigent-circumstances exception. At the other end of the spectrum is a 911 call where there is no identifiable caller nor

---

[21] *Compare Williams v. Maurer,* 9 F.4th 416, 432–34 (6th Cir. 2021) (finding that a reasonable juror could find that officers lacked reasonable basis for believing there were exigent circumstances where, even accepting the veracity of the anonymous caller's tip, the totality of the information provided by the anonymous caller was that there had been a disturbance in an unknown area in an apartment building, and the only indicia that the officers were at the right apartment was the presence of broken glass where the caller had mentioned hearing glass breaking, but the officers did not hear any signs of a disturbance despite the caller having mentioned screaming coming from inside the apartment); *Ward v. City of Hobbs*, 398 F. Supp. 3d 991, 1094 (D.N.M. 2019) ("The 911 caller's report of a verbal altercation and the subsequent dispatcher communication about a domestic dispute do not suffice as grounds for a reasonable belief that such an exigency existed."); *United States v. Benavidez,* No. 16-CR-1732 MCA, 2016 WL 9774947, at *4–6 (D.N.M. Dec. 19, 2016) (although the 911 call objectively did create a belief of an emergency of a woman being threatened with a knife, the objective belief of an emergency was dispelled prior to the warrantless search); *United States v. Martinez*, 686 F. Supp. 2d 1161, 1193 (D.N.M. 2009) ("[R]egardless whether other 911 calls may, in other cases, alone establish exigent circumstances, the Court does not believe the open-line 911 call in this case, without more, provides a sufficient basis for the exigent-circumstances exception."), *aff'd*, 643 F.3d 1292 (10th Cir. 2011); *United States v. Sikut*, 488 F. Supp. 2d 291, 306–08 (W.D.N.Y. 2007) (finding officers' reliance on 911 call to establish exigent circumstances objectively unreasonable where the information provided by the 911 caller "was not unambiguously indicative of a recent domestic dispute involving personal violence"), *with Schreiber v. Moe,* 596 F.3d 323, 331 (6th Cir. 2010) (reasonable basis for believing there was a risk of imminent injury to a child found where the officer knew that the 911 caller thought the child was being beaten after having recently spoken with her, and the officer, upon investigating, discovered an irate father so lacking in self-control that he shouted profanities at him for simply checking on the child's welfare"); *United States v. Najar*, 451 F.3d 710, 718–20 (10th Cir. 2006) (noting that, "911 calls are the predominant means of communicating emergency situations," and stating that the officers were aware that dispatch had been unable to make contact with the occupant of the home and, "[e]ven more alarming, someone was answering the phone but immediately placing it back on the receiver"); *United States v. Holloway*, 290 F.3d 1331, 1339 (11th Cir. 2002) (where officers received a dispatch from a 911 operator relaying a report of gunshots and arguing at the address, received a second dispatch indicating continued gunshots and arguing immediately thereafter, and, upon their arrival, there was nothing at the mobile home dissuading the officers from believing the veracity of the 911 calls, it was reasonable for the officers to conduct a search for possible gunshot victims); *United States v. Richardson*, 208 F.3d 626, 629–30 (7th Cir. 2000) (where officers' claim of exigent circumstances was based entirely on the 911 call, and the 911 operators had received a bogus call with almost exactly the same report only a week earlier, court observes that it was a "very close case" but ultimately concludes that "[t]he efficient and effective use of the emergency response networks requires that the police … be able to respond to such calls quickly and without unnecessary second-guessing"); *United States v. Bray,* No. 3:25-CR-57-CCB-SJF, 2026 WL 820466, at *3 (N.D. Ind. Mar. 25, 2026) (stating that "there was nothing to suggest to officers or the 911 dispatcher that the open call was in any way misstating the danger in the [ ] house that morning"; that "body camera footage of the incident confirmed ongoing harm in the house as it show[ed] that someone c[ould] be heard yelling from inside the residence as the police arrived"; and that, "[w]hile police walk[ed] around the side of the house, yells of 'I give up' and '911, 911' c[ould] be heard from inside").

specified emergency. … [T]his latter category of calls … is the least likely to justify a warrantless entry." *Martinez*, 686 F. Supp. 2d at 1192-93. The circumstances here are in dispute. And the parties have not focused their arguments under the second prong of the qualified immunity inquiry on exigent circumstances case law involving an anonymous 911 caller. Accordingly, the Court cannot say on the present record whether, assuming a constitutional violation, the Deputy Defendants are nonetheless entitled to qualified immunity because their warrantless search of Plaintiff's home based on an anonymous 911 call did not violate clearly established law.

### Conclusion

For the foregoing reasons, the Deputy Defendants' Motion for Summary Judgment (Doc. 26) is denied without prejudice. As discovery is now closed, any amended motion for summary judgment should be filed on or before May 4, 2026.

IT IS SO ORDERED this 30th day of March, 2026.

_____
KEVIN R. SWEAZEA
UNITED STATES MAGISTRATE JUDGE

24